**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

SERGEY A. MILLER,

Plaintiff,

v.

MAINE DEPARTMENT OF HEALTH AND HUMAN SERVICES; MICHELLE GALEGO; JENNIFER SHAW; SANDRA JELLISON; and SANDRA MARRON,

Defendants.

Civil Action No. _____

**COMPLAINT**

(42 U.S.C. § 1983 — First and Fourteenth Amendments; Maine Whistleblowers' Protection Act, 26 M.R.S. § 833)

**JURY TRIAL DEMANDED**

**PRELIMINARY STATEMENT ON CONFIDENTIALITY**

This Complaint concerns Plaintiff's refusal to falsify official child-welfare findings and the retaliation that followed. Because the underlying matters involve minor children whose records are confidential under Maine law, all children and families are referred to by initials or generic designations, and identifying details not essential to the claims have been omitted. Plaintiff respectfully requests that the Court permit these protections and will file any material containing confidential information regarding minors under seal as the Court directs.

**I. INTRODUCTION**

1. Plaintiff Sergey A. Miller brings this civil rights action pursuant to 42 U.S.C. § 1983 against his supervisors and the Maine Department of Health and Human Services for violations of his First and Fourteenth Amendment rights, and a supplemental claim under the Maine Whistleblowers' Protection Act, 26 M.R.S. § 833.

2. This case begins not in May 2026 but in January 2026, when APA Michelle Galego directed Plaintiff to falsify substantiated official child-welfare findings (the 'A. matter'). Plaintiff refused. Galego altered those findings in the official Katahdin system herself. Plaintiff has reason to believe the motivation was institutional rather than professional. Galego then authored discipline for Plaintiff's reaction to her own misconduct — a written warning issued not by Plaintiff's then-supervisor, in whose presence the underlying incident arose, but by the very official whose directive Plaintiff had refused. Supervisor Shaw was present and had already told Plaintiff she respected his refusal.

3. On the same day as the January write-up, a member of DHHS's own licensing unit visited the A. matter home and came to Plaintiff directly, stating she did not understand why District 3 was allowing the situation to continue. She had observed the same conditions Plaintiff and Senior Caseworker Shiok had documented and Galego had just erased. Plaintiff directed her to Galego. The licensing unit's records constitute independent corroboration of the original findings.

4. What followed over the next six months — the fabricated transfer policy, the progressive discipline stacking, the HR suppression directive, the PIP delivered in defiance of a written Cease and Desist, and the building removal the morning after three protected acts — was the continuation of a pattern of retaliation that began the moment Plaintiff refused to put his name on falsified child-welfare findings.

1

## II. PARTIES

5. Plaintiff Sergey A. Miller is a Child Protective Services Caseworker — Investigations, employed by Maine DHHS OCFS District 3, Lewiston area, covering Androscoggin, Franklin, and Oxford Counties. He is a member of MSEA-SEIU Local 1989 and is represented in related grievance proceedings by that union.

6. Defendant Jennifer Shaw served as Plaintiff's immediate supervisor. She told Plaintiff upon his entry into her unit that she respected his refusal to falsify the A. matter findings — establishing her actual knowledge of the protected activity from the beginning of the supervisory relationship. She was present when Galego delivered the January written warning; present at the March 2026 meeting where she witnessed Galego acknowledge the exculpatory professional-practice context and depart; and present at the June 3, 2026 transition meeting where she heard Defendant Marron characterize the factual basis for an adverse action as her subjective experience. Her own contemporaneous case-conference notes independently contradict the Written Reprimand's primary allegation. Shaw signed every disciplinary instrument that followed with full knowledge of Plaintiff's protected activity.

7. Defendant Michelle Galego served as Area Program Administrator and is the central actor in this case. She directed Plaintiff to falsify the A. matter findings; when he refused, she altered those findings herself in the Katahdin system and then wrote discipline for his reaction to her own misconduct. She ignored Plaintiff's repeated internal reports regarding a medication child-safety concern (the medication-safety matter) from February through June 2026, and took no action when Plaintiff asked directly what was being done to keep the child safe. She acknowledged the exculpatory professional-practice context of the primary disciplinary allegation in Shaw's presence and then issued a Written Reprimand that ignored that context. She admitted on audio recording that she conducted no investigation on the M.L. allegation at the moment of delivering formal discipline. As acting supervisor during Shaw's vacation, she supervised Plaintiff's performance improvement in real time and then used pre-improvement preliminary data — labeled 'preliminary management report' in the Warning document itself — to justify the Written Warning.

8. Defendant Sandra Jellison served as Program Administrator. Her course of conduct spans six months: participating in the issuance of the January written warning authored by Galego; using that warning as the stated basis to deny Plaintiff's lateral transfer while citing a three-year ineligibility policy that does not exist and was never produced; sending Plaintiff a written email stating she could keep him in Shaw's unit for up to three years; receiving Plaintiff's written email connecting the transfer denial to the A. matter and characterizing it as an ethical problem — thereby being placed on direct written notice of the falsification at the precise moment she was administering the transfer denial — and maintaining the denial; admitting the underlying directive had never been given to any other employee; and inserting herself into grievance proceedings from which she should have been recused.

9. Defendant Sandra Marron served as Plaintiff's incoming supervisor beginning June 3, 2026. At the June 3 meeting, attended by all four individual Defendants simultaneously with PIP delivery, Plaintiff challenged her account of an incident cited as a basis for adverse action, and Marron responded 'oh well that was my experience' — characterizing the factual basis as her subjective experience. On June 8 she sent an email characterizing the G. matter as a topic she and Jellison would discuss with Plaintiff on Friday — a scheduled future conversation, not an emergency — while assigning Plaintiff a 23-contact task with an insubordination threat. On June 9, the morning after three protected acts, she executed a full building removal citing the G. matter as a confidentiality emergency. Plaintiff had completed 10 of 23 contacts with one day remaining on Marron's own deadline. The stated removal basis is false, and Marron never asked Plaintiff a single question about the G. matter before executing the removal.

10. Defendant Maine Department of Health and Human Services is sued in its official capacity for declaratory and injunctive relief and as employer for the Maine WPA claim, pursuant to 42 U.S.C. § 1983 and Ex parte

Young, 209 U.S. 123 (1908).

## III. JURISDICTION AND VENUE

11. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Federal claims arise under 42 U.S.C. § 1983, the First Amendment, and the Fourteenth Amendment.

12. This Court has supplemental jurisdiction over the Maine Whistleblowers' Protection Act claim pursuant to 28 U.S.C. § 1367(a), as that claim forms part of the same case or controversy as the federal claims.

13. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), as Defendants reside in this district and a substantial part of the events occurred within this district, specifically in Androscoggin County, Maine.

## IV. STATEMENT OF FACTS

### A. The A. Matter — Where the Retaliation Began

14. In late 2025 or early 2026, Plaintiff and Senior Caseworker Jocelyn Shiok co-investigated the A. matter. Both independently concluded the findings should be substantiated, supported by documentary evidence including video evidence and firsthand observation of documented safety concerns in the home. Shiok, a senior caseworker, reached this professional judgment independently of Plaintiff.

15. APA Galego directed Plaintiff in person to rewrite the A. matter findings — to change the substantiation to no findings. Plaintiff refused, and documented his refusal in contemporaneous emails that exist on DHHS-controlled systems. Galego then altered the official Katahdin case closing herself, changing the substantiation to no findings over Plaintiff's objection and the independent professional judgment of a senior co-investigator. The Katahdin audit trail records this change: what was altered, by whom, and when.

16. Plaintiff has reason to believe the motivation for the alteration was institutional rather than professional — that the official record was altered to serve an administrative objective rather than an accurate professional assessment — and that Galego executed that alteration by overriding two caseworkers' professional judgment and changing the official government record herself.

17. The family sheltering the child filed an independent Ombudsman complaint after a family team meeting Galego attended, stating the agency was making the wrong move. Galego told Plaintiff directly that this complaint had been filed. That is a further independent source raising the same concern.

18. On the same day as the January written warning, a member of DHHS's licensing unit came to Plaintiff directly after visiting the home. She observed the conditions firsthand and stated she did not understand why the situation was being allowed to continue. Plaintiff directed her to Galego. The licensing unit's observations are documented in DHHS's records independently of the Katahdin case record and constitute independent corroboration of the original findings.

19. Plaintiff's refusal to falsify official child-welfare findings is protected activity outside Garcetti v. Ceballos, 547 U.S. 410 (2006). Plaintiff's job duties include making accurate findings; they do not include falsifying those findings at a supervisor's direction. Refusing an improper directive to falsify official government records is categorically different from reporting through internal channels.

### B. Shaw's Statement — Knowledge Established from Day One

20. When Plaintiff transferred into Supervisor Shaw's unit, Shaw told Plaintiff directly that she respected his refusal to rewrite the A. matter findings. This was said at the outset — before the January discipline, the March meeting, and every disciplinary instrument Shaw subsequently signed. Every document Shaw signed thereafter was signed with actual knowledge of Plaintiff's protected activity.

### C. The January 2026 Written Warning

21. Following Galego's alteration of the A. matter findings, and in the context of a same-day directive concerning an overnight hoteling assignment issued by Plaintiff's then-supervisor, Plaintiff was visibly upset at his desk. In the ordinary course, any discipline arising from that incident would have been addressed by the supervisor in whose presence it arose. It was not. The resulting written warning was authored by APA Galego — the official whose falsification directive Plaintiff had refused weeks earlier and whose alteration of the record had precipitated Plaintiff's distress — with Defendant Jellison participating in its issuance. The circumstances of that authorship — including whether Plaintiff's then-supervisor was asked to issue the warning and declined, and why the matter was instead handled at the APA and PA level — are within Defendants' exclusive knowledge and will be the subject of discovery. Plaintiff signed the warning and acknowledged in writing at the time that he should have maintained his composure, while noting that the reasons for his distress were clear. A member of District 3 management subsequently apologized to supervisors regarding the hoteling directives generally.

22. Jellison acknowledged that the underlying directive had never been given to another employee — that it was unprecedented. The January written warning was authored by Galego — the official whose misconduct prompted Plaintiff's reaction — and delivered with Shaw present.

23. Galego authored discipline for Plaintiff's reaction to Galego's own misconduct. Issuing discipline for an employee's reaction to the disciplining official's own wrongdoing is not a legitimate exercise of supervisory authority.

24. On January 30, 2026 — within weeks of the January warning and with full knowledge of the January incident — Shaw and Galego signed a State of Maine Performance Management Form rating Plaintiff Meets Expectations across all substantive categories, authorizing a merit increase, and attributing the single below-expectations notation to district-wide systemic conditions. This evaluation (Exhibit C) is irreconcilable with the discipline that followed sixteen weeks later.

### D. Jellison's Six-Month Course of Conduct

25. Jellison used the January warning as the stated basis to deny Plaintiff's lateral transfer. When Plaintiff challenged the policy basis, Jellison sent a written email citing a three-year ineligibility policy and stating she could keep Plaintiff in Shaw's unit for up to three years, adding words to the effect that Plaintiff should remember he had signed the discipline three months earlier. That policy does not exist; it was demanded and never produced. HR later reversed the denial, and Jellison's own supervisor, Field Operations Manager Jill Hunter, approved the transfer.

26. Plaintiff wrote back to Jellison directly, stating that if she wished to discuss professionalism and ethics they should discuss the A. matter. That email exists on DHHS systems. Jellison thus received direct written notice — at the moment she was using a fabricated policy to deny the transfer — that Plaintiff connected her conduct to the falsification and characterized it as an ethical problem. She maintained the denial.

27. During Jellison's vacation, Plaintiff met with Field Operations Manager Hunter and described the full pattern of conduct. Hunter approved the transfer to Defendant Marron's unit, stating 'we don't usually do this' — an acknowledgment that the denial had been outside normal practice.

28. Jellison was subsequently inserted into Plaintiff's June 8 supervision meeting — the same day the union grievance was advanced and the Ombudsman report filed — over Plaintiff's pending written recusal request. Her presence as the subject of active grievance proceedings constitutes an additional act of retaliation and interference.

4

**E. The Four-Incident Galego Pattern**

29. Galego engaged in a documented pattern of deliberate misrepresentation across four disciplinary incidents, each supported by an independent evidentiary source: (i) the A. matter (January 2026) — substantiation supported by video evidence and a senior co-investigator; Galego directed rewriting to no findings and, on refusal, altered the record herself, then authored discipline for Plaintiff's reaction; (ii) the T. matter (March 2026) — Galego heard Plaintiff's exculpatory professional-practice explanation in Shaw's presence, then issued a Reprimand omitting it; (iii) the M.L. allegation (May 2026) — Galego admitted on audio recording that she conducted no investigation before including it in the Written Reprimand; and (iv) the Written Warning (April–May 2026) — Galego, as acting supervisor overseeing Plaintiff's improvement in real time, used pre-improvement preliminary data (labeled 'preliminary management report') to justify the Warning. Same decision-maker; the same choice each time: accurate or mitigating information available, inaccurate version used in official discipline.

**F. The Medication-Safety Matter — Months of Ignored Internal Reports**

30. Beginning in approximately February 2026, Plaintiff identified and raised concerns internally regarding a medication child-safety matter affecting a child in care, repeatedly, through emails and reports to management including APA Galego, without adequate response.

31. When Galego engaged, her response focused on process review. Plaintiff asked directly: 'even with robust review, what are we doing to keep the child safe today?' Galego took no action in response.

32. On June 8, 2026, after months of internal escalation that produced no adequate response, Plaintiff formally filed a report with the Office of the State Ombudsman regarding the medication child-safety concern; the Ombudsman's office confirmed receipt. This filing constitutes protected citizen speech to an external government body outside the chain of command, protected under Lane v. Franks, 573 U.S. 228 (2014), regardless of Garcetti. It is one of three protected acts on June 8, 2026 — the day before Plaintiff was removed.

**G. The S. Matter — Discipline Without Review**

33. The S. matter was included in the Written Reprimand issued May 20, 2026. A two-hour recorded interview of the relevant interaction exists within DHHS's records. Management did not review that recording before including the parent's complaint in formal discipline. A DHHS staff member who compiled the extensive medical records for the S. matter — a serious child medical-abuse case — has direct firsthand knowledge of its complexity and is available and willing to testify.

34. An independent Agency QA review — obtained only after Plaintiff demanded it — found the parent characterizations cited in the Written Reprimand were inapplicable to Plaintiff's conduct, and that action should have been taken to reduce risk to the child. APA Galego took no action on that child-welfare finding. The supervisor who disciplined Plaintiff based on the S. matter simultaneously ignored the child-welfare risk-reduction recommendation from that same review.

**H. The March 2026 T. Matter Sequence**

35. On or about March 12, 2026, Plaintiff conducted an interview at a Child Advocacy Center in connection with the T. matter. An external complaint followed from CAC personnel.

36. On or about March 13, 2026, Galego convened a meeting with Plaintiff and Shaw to gather Plaintiff's account. In Shaw's presence, Plaintiff explained the professional-practice context, including that CAC personnel had been unprofessional first. Galego responded 'oh so they were unprofessional first,' then left in a manner consistent with going to write the response incorporating Plaintiff's account. Shaw remained and

witnessed the sequence.

37. The Written Reprimand incorporated none of this context. The exculpatory account Galego acknowledged in Shaw's presence was discarded. Galego's departure constituted behavioral evidence of an implied commitment to act on the information; the Reprimand demonstrates she did not.

**I. The Progressive Discipline Sequence**

38. On January 30, 2026 — sixteen weeks before the May discipline — Shaw and Galego signed a Performance Management Form rating Plaintiff Meets Expectations across all substantive categories with a merit increase, attributing the single below-expectations notation to district-wide systemic conditions.

39. On May 20, 2026 — sixteen weeks later, with no intervening performance review and no documented change in performance — the same two supervisors issued a Written Warning and Written Reprimand simultaneously, citing the same metrics and conduct categories as 'ongoing inability to meet professional expectations.' The only documented change in the interval was Plaintiff's protected activity.

40. On May 26, 2026, Plaintiff filed a formal CBA grievance through MSEA-SEIU Local 1989. Within seven days, Galego circulated a Transfer Supervision Meeting agenda with PIP delivery listed as Item 1.

41. On June 2, 2026, at 3:46 PM, Plaintiff served a formal written Cease and Desist demanding management cease implementing the PIP pending grievance review. The PIP was delivered at 9:30 AM on June 3, 2026 — 17 hours and 44 minutes later, established from the Employer's own email timestamps. Galego had circulated the PIP delivery agenda at 1:01 PM on June 2, before the Cease and Desist was served — establishing that delivery was predetermined.

42. The June 3 PIP was delivered at a meeting attended simultaneously by all four individual Defendants — Galego, Shaw (outgoing), Jellison (subject of a pending recusal request), and Marron (incoming) — a coordinated session designed to transmit a disputed management narrative to Marron before any neutral review.

43. On June 4, 2026, HR Director Malinowski issued a directive ordering Plaintiff to cease all HR correspondence, with Jellison — the subject of Plaintiff's HR complaints — copied. Malinowski retracted the directive after Plaintiff cited union rights, a self-executing acknowledgment that the directive was improper.

**J. The June 3 Transition Meeting**

44. At the June 3 meeting, Plaintiff directly challenged Defendant Marron's account of an incident used as a basis for adverse action. Marron responded 'oh well that was my experience' — characterizing the factual basis as her subjective experience, in front of all four individual Defendants. No Defendant disputed, corrected, or sought clarification.

**K. The G. Matter and the June 9 Removal**

45. On June 8, 2026, before emailing Marron about the G. matter, Plaintiff reviewed text messages from a law-enforcement detective (Detective M.) on his DHHS-issued work phone; the detective thanked Plaintiff for not interfering with his investigation. Plaintiff then emailed Marron, as incoming supervisor, that the G. matter safety plan was expiring and she needed to be aware of the active case status.

46. Marron's June 8 email characterized the G. matter as a topic she and Jellison would discuss with Plaintiff 'on Friday' — a scheduled future conversation, not an emergency — while assigning a 23-contact task with an insubordination threat. Plaintiff completed 10 of 23 by the following morning, with one full day remaining on Marron's own deadline, when he was removed.

47. On June 8, 2026, Plaintiff completed three protected acts: (i) the CBA grievance was formally advanced; (ii) Plaintiff filed the Ombudsman report, receipt confirmed; and (iii) Plaintiff contacted an attorney — all the day before the removal.

48. On June 9, 2026, the morning after the three protected acts, Plaintiff was escorted from the building. The stated basis — that Plaintiff leaked information via police contact connected to the G. matter — is false. Detective M.'s text messages, establishing that Plaintiff protected the investigation and was thanked for it, are on the DHHS-issued work phone now in DHHS's physical possession. Marron never asked Plaintiff a single question about the G. matter before the removal. The second stated basis — disclosure of confidential client information — is also false: the communication was an internal supervisor-briefing email sent within DHHS to Plaintiff's own incoming supervisor.

### L. Post-Removal: Twenty-Three Days of Investigatory Silence

49. On June 9, 2026, at 4:34 PM, MSEA-SEIU Representative Krystal Talbot emailed DHHS HR noting representation, requesting a time change for the June 16 interview, and demanding a Garrity warning before any interview. DHHS committed in writing to reschedule — a commitment never honored.

50. June 16, 2026 passed with zero contact. On June 24, Representative Talbot noted her June 26–July 7 vacation and offered June 24–25 as final windows; no response. As of July 2, 2026 — Day 23 — there had been zero investigatory contact, two unanswered union communications, no Garrity warning, and no rescheduled date, while DHHS held Plaintiff's work phone containing the exculpatory texts.

51. Twenty-three days of complete investigatory silence following a stated confidentiality emergency — while DHHS controls the device containing the evidence disproving its own removal basis — is not consistent with a legitimate investigation.

### V. CLAIMS FOR RELIEF

### COUNT I — First Amendment Retaliation (42 U.S.C. § 1983)

52. Plaintiff's refusal to falsify the A. matter findings is protected citizen speech; his job duties include making accurate findings, not falsifying them on direction, and the refusal falls outside Garcetti. Plaintiff's June 8 Ombudsman report is protected citizen speech to an external body outside the chain of command under Lane v. Franks. The adverse actions — the January warning, the transfer denial under a fabricated policy, the Written Warning on pre-improvement data, the Written Reprimand, the PIP delivered 17 hours 44 minutes after the Cease and Desist, the HR suppression directive, and the June 9 removal the morning after three protected acts — were each substantially motivated by Plaintiff's protected activity, with temporal proximity measured in hours on the most recent actions.

### COUNT II — Fourteenth Amendment Due Process (42 U.S.C. § 1983)

53. Plaintiff has a protected property interest in continued employment as a civil-service employee under a CBA requiring just cause. The disciplinary process across all instruments was constitutionally deficient, and the post-removal process — twenty-three days with no interview, no Garrity warning, no rescheduled date, and no communication, while DHHS holds the work phone containing exculpatory evidence — is not constitutionally adequate.

### COUNT III — Maine Whistleblowers' Protection Act, 26 M.R.S. § 833 (Supplemental)

54. The Maine WPA prohibits retaliation against an employee who reports what the employee reasonably believes is a violation of law or a condition risking the health, safety, or welfare of any individual. Plaintiff's A. matter refusal, his contemporaneous emails and his disclosures to Hunter, his internal medication-safety

reports from February through June 2026, and his June 8 Ombudsman report are each protected; each adverse action following each protected report constitutes WPA retaliation.

**Response to Anticipated Qualified-Immunity Defenses**

55. No reasonable official could have believed the conduct alleged was within the scope of legitimate authority. Galego directed falsification of official child-welfare records, altered them herself, authored discipline for Plaintiff's reaction to her own misconduct, and repeatedly used inaccurate information in official discipline. Jellison used discipline to trap Plaintiff under a fabricated policy and maintained the denial after written notice connecting it to the falsification. Marron removed Plaintiff the morning after three protected acts on a basis contradicted by evidence the employer controls, without asking a single question. Shaw signed discipline she knew to be contradicted by her own contemporaneous notes, with actual knowledge of the protected activity. Qualified immunity is unavailable as to each.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Enter a declaratory judgment that Defendants violated Plaintiff's rights under the First and Fourteenth Amendments and 42 U.S.C. § 1983, and that Maine DHHS violated the Maine Whistleblowers' Protection Act, 26 M.R.S. § 833;

b. Grant injunctive relief including complete expungement of all disciplinary records (the January 2026 Written Warning, the May 20, 2026 Written Warning, the May 20, 2026 Written Reprimand, the June 3, 2026 PIP, and all administrative-leave documentation) from all files and databases; reassignment away from Defendants Shaw, Galego, Jellison, and Marron; and restoration of full workplace access;

c. Award compensatory damages against the individual Defendants, including back pay and lost benefits from June 9, 2026 through reinstatement, and emotional-distress damages supported by contemporaneous documentation;

d. Award punitive damages against the individual Defendants, and particularly Defendant Galego, whose documented pattern satisfies the reckless-or-callous-indifference standard of Smith v. Wade, 461 U.S. 30 (1983);

e. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988 and the Maine WPA;

f. Enter a preservation order directing Defendants to preserve: the Katahdin audit trail for the A. matter; DHHS licensing records for the A. matter site visit; Plaintiff's DHHS-issued work phone in forensic read-only form; all medication-safety internal escalation emails and responses; the Jellison transfer-denial email chain and Plaintiff's response; the Galego overtime-approval communications; the complete A. matter case file including video evidence; the June 8 Ombudsman correspondence; the two-hour S. matter interview recording; and all documents concerning the authorship, drafting, and issuance of the January 2026 Written Warning, including any communications with or concerning Plaintiff's then-supervisor regarding that warning; and

g. Grant such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED.

Dated: July 6, 2026

X ___/s/ Sergey A. Miller_____

Signed electronically pursuant to Fed. R. Civ. P. 5(d)(3) and D. Me. Local Rules
Sergey A. Miller, Plaintiff pro se

Sign in ink before filing.

33 Ninth Street, Auburn, ME 04210 | (207) 212-6852 | sergeymiller19@gmail.com

Prepared with AI assistance for Plaintiff's review. Not legal advice. Before filing, confirm the correct mechanism (amendment as of right under Fed. R. Civ. P. 15(a)(1) before service, or substitution at docketing) with the Clerk of Court (District of Maine) or counsel, and verify all case citations. The January warning authorship question is preserved for discovery (see paragraph 21 and Prayer f).